MICHAEL O'CALLAGHAN and MARTHA O'CALLAGHAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Callaghan v. Commissioner
Docket No. 10399-81.
United States Tax Court
T.C. Memo 1984-214; 1984 Tax Ct. Memo LEXIS 452; 47 T.C.M. (CCH) 1661; T.C.M. (RIA) 84214; April 25, 1984. *452 John P. Callahan, for the petitioners. Mark S. Priver, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a $5,026.67 deficiency in petitioners' 1977 Federal income tax. The only issue for decision is whether, in the circumstances of this case, the Commissioner erred in allocating a portion of the selling price of petitioner Michael O'Callaghan's wholly-owned travel agency to a covenant not to compete in an amount equal to the amount specified for such covenant in the written sales agreements. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners Michael and Martha O'Callaghan, husband and wife, resided in the State of California when they filed their petition herein. References to "petitioner" in the singular will be to Michael O'Callaghan. Petitioner is a former Roman Catholic priest. In 1971, after leaving the *453 priesthood, he, in partnership with his brother, opened "O'Callaghan Travel Services", a retail travel agency. They operated this travel agency until sometime before early 1975 when their partnership "split". In January 1975, petitioner formed another retail travel agency, "Golden Sun Travel & Tours" (Golden Sun). He operated this agency as a sole proprietorship and utilized the cash method of accounting in computing its net taxable income or loss. Petitioners' Federal income tax returns for 1975, 1976, and 1977 reported Golden Sun's receipts and net profits or losses as follows: Gross Receipts [2]
Net Loss
1975
$293,687.84
$5,581.00
1976
371,957.86
3,099.11
1977 [3]
249,410.89
1,069.02
*454 At about the time petitioner was organizing Golden Sun, he obtained part-time employment teaching a "travel" course. By the end of 1975 and during the first half of 1976, he was teaching travel and tourism courses at at least two different colleges on a part-time basis. In the fall of 1976, he became a "full-time" instructor with the Los Angeles community college system. This last assignment required petitioner to teach three days a week and to be present on campus five days a week. In spite of this condition, petitioner appeared to be able to continue to manage his travel agency at least to some extent. Petitioner nevertheless found it difficult both to teach "full time" and to run his travel agency effectively. Although he was able to "generate" increasingly higher gross receipts "through * * * [his] employees", he found himself "strapped, physically and somewhat financially". Accordingly, on or about November 5, 1976, he entered into an exclusive brokerage agreement with George Meadows (Meadows) dba Omega Business Sales (Omega), wherein he authorized Omega to sell Golden Sun for a total purchase price of $45,000, $20,000 of which was payable immediately and the rest *455 of which was payable within five years at nine percent interest per annum. The brokerage agreement also noted that "[s]eller may be willing to continue on as consultant" and that "[s]eller teaches travel business in local schools". On January 7, 1977, Charles Bartlett (Bartlett), a businessman who had no experience in the retail travel business (but who had taken a three-month course in travel), offered to purchase the fixtures, equipment, leasehold improvements, goodwill and lease of the travel agency for $45,000, payable in $20,000 cash and a $25,000 interest-bearing note. The terms of the offer also included the following: Subject to approval of books & records. Seller agrees to management involvement over the next 2 years. (details to be agreed to by both parties). All funds to be refunded if buyer is not approved for appointment with ATC and IATA. [4] Covenant not to compete for 2 years. Although the parties appear to have reached an understanding *456 at a time not clearly disclosed in the record that Bartlett would purchase the travel agency, they nevertheless continued to negotiate thereafter. One of the matters they considered was the amount of time during which petitioner would not compete with Bartlett. Bartlett desired a five-year covenant not to compete, but petitioner would agree only to a two-year restriction, and eventually they agreed to this shorter covenant. At no time did the parties discuss the value to be ascribed to the covenant. On February 25, 1977, Bartlett and petitioner entered into an escrow agreement for the sale of Golden Sun. This agreement fixed a new selling price of $40,000 and contained the following declarations: The parties hereto agree that there are no representations between them, or by the Broker, which are not specifically set forth herein, and they further agree that this escrow supercedes and voids any prior agreements, whether written or oral. * * * As part of the consideration herein paid, the Seller does covenant to the Buyer that he will not engage, either directly or indirectly, in the retail travel agency business for a term of two (2) years from the date of possession of *457 the business by buyer. The value placed on this covenant is to be the sum of $20,000.00. * * * The purchase price is to be credited as follows: Covenant Not to Compete
$20,000
Furniture fixtures & equipment
8,000
Good Will
12,000
TOTAL CONSIDERATION
$40,000
Also on February 25, 1977, petitioner signed an agreement not to "enter or engage in the retail travel agency business * * * for a period of Two (2) Years". This agreement further stated that "[t]he value placed on this covenant is to be the sum of $20,000". On March 3, 1977, petitioner and Bartlett signed a second escrow agreement. Like the earlier escrow agreement, it listed a selling price of $40,000 and recited the declarations reproduced above. In addition, it contained certain new provisions, one of which read as follows: Buyer and Seller agree that Seller will assist Buyer through the first 90 days subsequent to the close of escrow as follows: Seller will visit office of subject travel agency on an average of three (3) times per week and provide a reasonable amount of Seller's time at said agency in review of activities of agency employees and of agency transactions, thereby providing *458 Buyer with guidance as to the operation of said travel agency. Petitioner did not object to the allocation of $20,000 to the covenant not to compete. He did ask Meadows about the effect of such allocation and Meadows responded that it "had no bearing on * * * [petitioner]" but that Bartlett's "attorney or taxman" wanted it. Petitioner did not question further the effect of the allocation before signing the agreements. He instead relied upon Meadows' representation that it "had no bearing". Following the consummation of Golden Sun's sale, petitioner fulfilled his 90-day obligation to provide training and assistance to Bartlett. He answered questions, advised the staff with respect to sales reporting, group contracts, and credit card sales, mediated during an Air Traffic Conference investigation, attended commercial account negotiations, and helped hire a qualified manager for the agency. In addition, pursuant to a separate oral agreement, he agreed to sell travel to new customers on a split commission basis. Petitioner was thus paid gross commissions of $1,297.40 in 1977 and approximately $2,000 in 1978. On their 1977 income tax return, petitioners reported $15,046.52 *459 of gain on the sale of Golden Sun, computed as follows: Selling Price
$40,000.00 Minus: Basis in Assets
(20,775.18)
Minus: Selling Commissions
and Closing Costs
(4,178.30)
$15,046.52 They apportioned this gain pro rata based upon an allocation of selling price, as follows: Apportioned
Apportioned
Selling Price
Gain
Personal Property
$ 3,912.79
$ 1,471.55
Leasehold Improvement
362.39
136.92
Goodwill
35,724.82
13,438.05
$40,000.00
$15,046.52
They reported the gain with respect to the personal property and leasehold improvement as ordinary income and the gain with respect to the goodwill as long-term capital gain. In the deficiency notice herein, the Commissioner determined that the gain on sale of Golden Sun was $31,547 [5] and that such gain should be apportioned with respect to the allocation of selling price found in the escrow agreements as follows: Minus:
Minus: Selling Ex-
Selling [6]
Adjusted
penses (Allocated
Gain
Price
Basis
on Selling Price)
On Sale
Furniture
$ 8,000
$4,275
$ 836
$ 2,889
Goodwill
12,000
1,253
10,747
Covenant not
to compete
20,000
2,089
17,911
$40,000
$4,275
$4,178
$31,547
*460 He characterized the gain as follows: Furniture:
$ 1,435
Sec. 1245, I.R.C. 1954, gain
1,454
Long term capital gain
Goodwill:
10,747
Long term Capital gain
Covenant not
to compete:
17,911
Ordinary Income
Petitioners now argue that the allocation of the selling price in the sales agreement should be ignored and that the amount allocated to the covenant not to compete should be reallocated to goodwill. If the Commissioner's allocation of $20,000 to the covenant not to compete should be sustained, petitioners do not challenge the other computations made by the Commissioner. OPINION In their breakdown of the gain on sale of Golden Sun, petitioners disregarded the components of the selling price recited in the various written agreements signed by petitioner Michael O'Callaghan, and completely ignored *461 the allocation of $20,000 to the covenant not to compete. However, "when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strongproof must be adduced by them in order to overcome that declaration". (emphasis supplied), affg. . See also , affg. ; . [7]
*462 The determination of whether a party has "adduced" the requisite "strong proof" demands an examination of whether the covenant has "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement". . See also , affd. sub nom. ; ; . We find that petitioner's covenant not to compete with Bartlett had independent economic significance and that "reasonable men * * * might bargain for such an agreement". In any event, petitioners have failed to adduce "strong proof" to the contrary. Petitioners stress that petitioner never negotiated a value to be ascribed to the covenant not to compete and contend, therefore, that the covenant had no value. However, they readily admit that there were negotiations with respect *463 to the duration of the covenant. Indeed, the record contains convincing evidence that petitioner and Bartlett were certainly concerned at least about the length of the restriction. For example, Bartlett requested a five-year covenant but petitioner refused to consider any covenant with a duration longer than two years. In view of the evidence of arms-length negotiations, we do not agree with petitioners that the covenant had no value. See , affg. . Petitioners also contend that the covenant had no economic value because petitioner's teaching schedule prevented him from competing. The evidence does not support this contention. It establishes at most that it would be difficult for petitioner to operate a travel agency while teaching, but this misses the point. The purpose of a covenant not to compete is to protect a buyer from potential economic intrusions by a seller. In the absence of the covenant, petitioner might easily threaten Bartlett's economic interest in Golden Sun by, for example, selling travel part-time for another agency (i.e., as opposed to selling *464 travel and administering the agency) as he did for Bartlett. [8] And there was no assurance that petitioner might not stop teaching and start a new agency, devoting himself exclusively to the travel business. Petitioners argue that we should ignore the allocation of the selling price in the written agreements of sale because Meadows misrepresented the tax effect of such allocation. We do not agree. The focus of our inquiry is on whether the allocation possesses economic reality and whether petitioner in fact agreed to it.On this record the answer to both questions must be in the affirmative. The fact that Meadows may have misrepresented [9] the tax effect of the allocation is not inconsistent with the validity of the allocation. Petitioners presented no evidence that the allocation was economically unrealistic, and the evidence is clear that petitioner accepted the *465 two-year covenant not to compete and the allocation. Cf. . *466 The record hardly establishes, as petitioners intimate, the type of misrepresentation which would allow the recision of those provisions in the selling agreements which allocate the selling price.Meadows' statement involved a conclusion of law, not a representation of fact. Implicit in his statement was an incorrect interpretation of the legal consequences of the allocation.But even an outright misrepresentation of a matter of law (the correctness or incorrectness of which is fully open to examination by anyone) has long been recognized as simply not the kind of thing that invalidates the effect of a contractual undertaking. . Cf. ; ; , affd. . No cases involving applicable California law to the contrary have been called to our *467 attention. Finally, as already indicated, this is not a case where there was no bargaining over the covenant not to compete. Petitioner resolutely refused to accept a five-year period and insisted upon accepting only a two-year limitation on his activities. This misrepresentation allegedly made by Meadows was concerned, not with the covenant itself, but only with the allocation of the $20,000 portion of the purchase price to that covenant. Yet, the covenant plainly had some value, and even if the $20,000 allocation portion of the sales agreement be considered as not binding by reason of Meadows' misrepresentation, it was incumbent upon petitioner to show how much should be allocated to the covenant.But he produced no such evidence, and, therefore, regardless of the legal effect of Meadows" misrepresentation, petitioner has failed to carry his burden to establish that the Commissioner's allocation of $20,000 to the covenant was erroneous. Decision will be entered for the respondent.
Footnotes
1. The deficiency notice herein also includes an adjustment allowing an increase in the carryover of a prior year capital loss. This adjustment is not in issue.↩
2. The amounts reported as gross receipts included all payments received from customers. After collecting such payments, petitioner, generally, would forward the amount, minus a commission "of anywhere from 8 percent to 9 percent" to the "provider of the travel services". Thus, Golden Sun's gross commissions were much less than those amounts reported as gross receipts. ↩
3. Because petitioner sold Golden Sun during 1977, the 1977 return reported only a portion of Golden Sun's total 1977 revenues and expenses.↩
4. The terms ATC and IATA refer to Air Traffic Conference and International Air Transport Association. They license the selling of airline tickets, the former for domestic travel and the latter for international travel.↩
5. This amount differs from the amount of gain reported by petitioners apparently because the Commissioner reduced petitioners' basis in Golden Sun's assets by about $16,500. This amount of gain thus redetermined by the Commissioner is not in dispute. ↩
6. The Commissioner's allocation of selling price is that found in the escrow agreements.↩
7. The Government once again urges us to reject the "strong proof" standard in favor of the stricter standard of , vacating and remanding , in determining whether petitioners are bound by the written allocation. We again refuse to reconsider the matter. See ; , affd. .↩
8. We do not agree with petitioners' suggestion that petitioner's selling travel to new clients for Bartlett destroyed the economic value of the covenant. Petitioner's selling was in no way similar to starting a new competing↩ agency and in fact assisted rather than hurt Bartlett's economic interests.
9. Even the question whether Meadows had in fact made any such representation to petitioner was open to dispute. Petitioner testified that Meadows represented that the allocation would "have no bearing on" petitioner. But the Government had an affidavit signed by Meadows in which he allegedly stated that during the negotiations for the sale of the travel agency he at no time ever represented to petitioner that an allocation of the purchase price to a covenant not to compete would not have any effect on petitioner. The Government incredibly failed to subpoena Meadows to testify, but instead attempted to use the affidavit. We ruled at the trial that the affidavit was inadmissible in evidence, particularly since Meadows, who was not shown to have been unavailable as a witness, was not there to be cross examined. Since we regarded petitioner in general as a credible witness, we found on the basis of his testimony, in the absence of any evidence to the contrary, that Meadows had in fact made the disputed representation. Whether we would have made such finding if Meadows had been present to testify and if he would have convincingly withstood cross examination is a matter upon which we need not now speculate.↩